1

2

3

4

5

6

7

8

9

10 **UNITED STATES DISTRICT COURT**

11 **DISTRICT OF NEVADA**

12

13 NATALIE EGBERTO and SARA SMITH )        3:08-cv-00312-HDM-VPC
   individually, jointly and on )
14 behalf of RICKY EGBERTO, )
                                        )        ORDER
15            Plaintiff, )
                                        )
16 vs. )
                                        )
17 E.K. MCDANIEL, individually and )
   in his official capacity as )
18 Warden of the Ely State Prison; )
   HOWARD SKOLNIK, individually and )
19 in his official capacity as )
   Director of the Nevada Department )
20 of Corrections, )
                                        )
21            Defendants. )
   _____)

22 **I.   Statement of Facts**[1]

23

24       Defendants are E.K. McDaniel and Howard Skolnik of the Nevada

25 _____

26       [1] The facts recounted in this section were drawn from the parties' motions for

   summary judgment, oppositions and attached exhibits. See Docket No. 131 Exs. A-P,

27 PP ; Docket No. 132; Docket No. 134 Exs. A-J; Docket No. 151 Ex. A; Docket No. 153

28 Exs. 1-31.

1

Department of Corrections ("NDOC").  Defendant E.K. McDaniel is the Warden of Ely State Prison.  Defendant Howard Skolnik is the Director of the Nevada Department of Corrections.

Plaintiffs are Natalie Egberto, Sara Smith and Ricky Egberto.[2] Plaintiff Natalie Egberto is the wife of Ricky Egberto and mother of Sara Smith.  Plaintiff Sara Smith is the daughter of Natalie and Ricky Egberto.  Plaintiff Ricky Egberto is an inmate committed to the custody of the NDOC. He is currently serving a life sentence for murder.

On October 19, 2005, plaintiffs Natalie Egberto and Ricky Egberto had a contact visit in Nevada's Ely State Prison visiting room.  The visit lasted approximately six hours.  After the visit, Natalie Egberto left the prison and Ricky Egberto was escorted back to his cell.  Prior to being escorted back to his cell, Ricky Egberto received an unclothed body search by correctional officers. Ricky Egberto's outer body and clothes were examined for contraband.  He was asked to squat and cough while naked, but his body cavities were not searched.  No contraband was discovered during the body search.

Later that day, Ricky Egberto was found unresponsive in his cell having overdosed on heroin.  He received emergency medical treatment.  Two puncture marks were discovered on his arm at the vein and a bloody piece of toilet paper was found in his hand.

---

[2] Ricky Egberto's name is also spelled "Rickey Egberto" in some of the documents and motions associated with this case.  The Docket and motions by plaintiffs use "Ricky", while motions and exhibits filed by defendants use "Rickey".

While Ricky Egberto received medical treatment, correctional officers searched his cell for contraband.  The officers found a syringe, a syringe cap, pieces of cellophane that smelled of feces, a piece of metal foil with narcotics residue, two pieces of red balloon, a 3.5 inch locking knife with a serrated blade, and a hand cuff key.

On October 20, 2005, Natalie Egberto returned to the prison for a scheduled follow-up visit with her husband.  After entering the gate house to Ely State Prison, but prior to entering the facility, she was stopped by officers from the Nevada Department of Corrections, the State of Nevada Division of Public Safety, and the White Pine County Sheriff's Office.  Officers escorted her back to her car, where she consented to a vehicle search.  A drug K-9 dog "Buster" was used to search the outside of Natalie Egberto's vehicle.  "Buster" alerted to the presence of narcotics inside the vehicle.  The entire vehicle was subsequently searched.  Officers seized an overnight bag from the backseat of the vehicle.  Inside the bag were several red balloon tops and a plastic bag containing a brown substance that field tested positive for heroin.  The Washoe County Sheriff's Office Forensic Science Division later confirmed the substance was heroin.  Many of these items matched the items found the day before in Ricky Egberto's cell after his overdose.

Based on this evidence, the NDOC Inspector General's Office concluded that Natalie Egberto was the source of the contraband found in Ricky Egberto's cell.  Warden E.K. McDaniel terminated the Egbertos' visiting privileges. State criminal charges were filed against Natalie Egberto relating to the incident, but those charges

were eventually dismissed and her criminal record sealed.  A prison disciplinary hearing was held for Ricky Egberto; he was adjudicated guilty of MJ 26 (possession of contraband) and MJ 53 (possession/sale of intoxicants).  MJ 53 is a class A offence and sanctions are determined on a case by case basis.  Because of the serious nature of the offences and because they involved visitors to the prison, Ricky Egberto received a two year disciplinary segregation sentence which included a suspension of his visiting privileges.

Ricky Egberto had been disciplined in 1997 for smuggling contraband into another Nevada prison.  On or about November 9, 1997, a woman named Linda Husky visited Ricky Egberto while he was housed at Nevada State Prison.  Officers had been alerted to a potential smuggling attempt while monitoring Ricky Egberto's phone calls.  Consequently, Linda Husky was stopped at the prison gate house and escorted to her vehicle, where she consented to a search. Balloons containing methamphetamine were discovered in Linda Husky's trunk.  She was taken into custody and transported to the Carson City Sheriff's Office for further questioning.  While there, she admitted to secreting several balloons containing methamphetamine in her vagina.  This incident resulted in a sanction for Ricky Egberto and the termination of Linda Husky's visitation privileges at all NDOC facilities.

According to prison records, Ricky Egberto has an extensive disciplinary history.  He began his life sentence in Nevada in 1984.  In October 1985, he was transferred to the California Department of Corrections and Rehabilitation (CDRC) where he remained for eleven years before being transferred back to Nevada

4

due to management problems he caused.  Ricky Egberto was involved in several incidents while in the custody of the CDRC, including disobeying orders, fighting (two incidents), manufacturing alcohol (four incidents), use or possession of drugs or drug paraphernalia (four incidents), possession of a .22 caliber bullet, and possession of a shank.  In September 1998, he was transferred again – to the Wyoming Department of Corrections (WDOC).  While there he committed at least ten major disciplinary infractions, including arson, substance abuse, propelling a substance, possession of contraband, threats, bullying inmates and correctional staff, and a major disturbance that necessitated the use of a prison tactical team.  As a result, he was isolated from all other inmates at WDOC and was eventually returned to Nevada.  Since his return to Ely State Prison, Ricky Egberto has pled guilty or been found guilty of the following major violations: threats (four incidents); possession of contraband (six incidents); property damage (two incidents); drug or alcohol possession of use (five incidents); organizing a work stoppage or demonstration (two incidents); battery; possession or use of a recording device; and unauthorized use of equipment or mail (two incidents).  Specifically, in relation to and since the October 19, 2005 smuggling incident, he has incurred the following offences and disciplinary sanctions:

- On 10/19/2005 found guilty of MJ 26 possession of contraband and sanctioned to 546 days disciplinary segregation effective 10/26/2005.
- On 10/19/2005 found guilty of MJ 53 possession of intoxicants and sanctioned to 730 days disciplinary segregation effective 4/25/2007.

1    •    On 12/08/2006 found guilty of MJ 26 and sanctioned to

2         disciplinary segregation for 90 days effective 4/24/2009.

3    •    On 11/15/2008 found guilty of MJ53 and sanctioned to 18

4         months of disciplinary segregation and 12 months of loss

5         of visiting privilege effective 12/24/2008.

6    •    On 8/19/2009 found guilty of MJ 53 and sanctioned to 90

7         days disciplinary segregation effective 10/1/2009.

8    This list is not exhaustive.  *See* Defendants' Mot. Summ. J. Ex. E.

9    He has been in disciplinary segregation with loss of visiting

10   privileges almost without interruption from October 2005 to the

11   present.

12       Ricky Egberto's visiting privileges with Natalie Egberto and

13   Sara Smith were suspended based on his disciplinary history

14   beginning in October 2005.  Natalie Egberto's visiting privileges

15   were suspended as a result of the suspension of Ricky Egberto's

16   privileges and because of her involvement in the October 19, 2005

17   smuggling incident.  In an October 26, 2005 email from Deputy

18   Director of NDOC Dorothy Holmes to then counsel for plaintiff Ricky

19   Egberto, Holmes stated that "[i]nmates caught 'dirty' lose in-

20   person visitation for 2 years." Egberto Mot. Summ. J. Ex. E.  In

21   accordance with prison regulations, Natalie Egberto has petitioned

22   Warden McDaniel to reinstate her visiting privileges with Ricky

23   Egberto every six months. *Id.* Exs. H-M. These requests have been

24   denied consistently. *Id.*

25       Sara Smith is permitted to visit Ely State Prison, but is not

26   permitted to visit Rickey Egberto. See Docket No. 118.  She first

27   requested visitation with him on June 6, 2005, but, because she was

28   on another inmate's visitor list at that time, she was denied

visitation with Ricky Egberto.  She was not eligible for visitation
with Ricky Egberto until after the October 19, 2005 smuggling
incident.  After the smuggling incident, Ricky Egberto's visiting
privileges with all visitors were suspended in accordance with
prison policies. Sara Smith requested and was briefly granted a
visit with Ricky Egberto in December 2007, but that request was
later denied because Ricky Egberto was not allowed visitors.
Egberto Mot. Summ. J. Ex. G.  Sara Smith has not been suspected of
smuggling contraband into the NDOC, nor has she been implicated in
any wrong doing.

## II.  Statement of the Case

On June 19, 2008, plaintiffs filed this action under 42 U.S.C.
§ 1983 against the defendants in the United States District Court
for the District of Nevada. Docket No. 6.  An amended complaint was
filed on August 29, 2008. Docket No. 9.  In their amended
complaint, plaintiffs alleged infringement of their First Amendment
associational rights and deprivation of their Fifth and Fourteenth
Amendment due process and equal protection rights based on the
denial of their visiting privileges with Ricky Egberto since
October 19, 2005. *Id.*

On September 29, 2008, defendants filed a motion to dismiss,
Docket No. 11, which this court granted in part and denied in part
on March 25, 2009. See Docket No. 22.  The defendants' motion to
dismiss was granted as to plaintiffs' Fifth Amendment claims and
claims for monetary damages against the defendants in their
official capacity, and was denied as to all other claims.  *Id.*
Defendants answered the amended complaint denying all causes of

action and requests for relief on May 7, 2009. Docket No. 33.
Discovery in this case closed on May 25, 2010.

Presently before the court is defendants' motion for summary
judgment. Docket No. 134.  Plaintiffs have opposed the motion.
Docket No. 153.  Also before the court are plaintiffs Natalie and
Ricky Egberto's motion for summary judgment, Docket No. 131, and
plaintiff Sara Smith's motion for summary judgment. Docket No. 132.
Defendants have opposed these motions. Docket No. 152 and Docket
No. 151, respectively.

Defendants' motion for summary judgment argues that the
indefinite suspension of plaintiffs' visiting privileges was a
rational response to a suspected security threat, that it is Ricky
Egberto's conduct that prevents him from receiving visitors,
therefore, suspension of plaintiffs' visiting privileges does not
violate the Fourteenth and First Amendments. See Docket No. 134.
They also argue that plaintiff Sara Smith lacks standing to assert
a violation of NDOC Administrative Regulation 707 and the
defendants are entitled to qualified immunity.

Plaintiffs Ricky and Natalie Egberto argue in their motion for
summary judgment that their visiting privileges are being
unconstitutionally denied because: (1) NDOC policy, specifically AR
707, mandates reinstatement of visitation after a two year
sanction; (2) NDOC officials indicated that their visiting
privileges would be restored after two years; (3) all formal
criminal charges against Natalie Egberto relating to the October
19, 2005 smuggling incident were dismissed and her criminal record
sealed, thus the smuggling incident is not a valid reason to deny
Natalie Egberto's visiting privileges; (4) Ricky Egberto refused to

disclose the source of the contraband and his visiting privileges are being denied in retaliation; and (5) Ricky Egberto is being treated differently from similarly situated inmates who have had their visiting privileges taken away based on similar major violation offences and then restored pursuant to AR 707. See Docket No. 131.  Plaintiffs assert the denial of their visitation is a violation of their Fourteenth Amendment due process and equal protection rights and their First Amendment right of association.

Plaintiff Sara Smith's motion for summary judgment argues that the denial of visitation with Ricky Egberto is irrational because she has never been suspected of wrong doing and the denial is based only on her familial relationship to the other plaintiffs. See Docket No. 132.  She argues that this restriction on visitation is not in keeping with AR 707 and violates her due process rights and her first amendment right of association. Sara Smith has also joined in Natalie and Ricky Egberto's motion for summary judgment. Docket No. 139.

III.      Relevant NDOC Policies

AR 707 governs discipline of inmates.  Offences relating to the introduction, possession and use of drugs or contraband at the prison subject an inmate to disciplinary segregation and loss of visiting privileges. Sanctioning an inmate for major violations (MJ) is done on a case by case basis. AR 707.06. *See* Def. Opp'n Egberto Mot. Summ. J. Ex. A.  "An inmate may not be subject to the loss of visiting privileges unless the misconduct relates specifically to an incident involving visitors or MJ44/53/54 conviction (see 707.12)." AR 707.06 subsection 1.7 (emphasis

added).  Further, inmates found to have drugs or alcohol in their
systems – specifically in violation of MJ 54 (positive urine test)
and MJ 44 (refusal to test) – will have "<u>NO</u> visits for one calendar
year from the date of the incident [and a]ll visits will then be
non-contact for the second calendar year." *See* Def. Mot. Summ. J.
Ex. F.  AR 707.12 subsection 1.5.  "Inmates may request contact
visit restoration following completion of the one (1) year no
visiting period through the grievance process."  AR 707.12
subsection 1.6.  The reinstatement of no-contact visits after a one
year loss of all visiting privileges appears to be specific to MJ
54 and MJ 44 violations.  However, since Class A major violations,
such as MJ 53, are evaluated and sanctions are imposed on a case by
case basis, AR 707.12's visiting sanction could be applied to MJ 53
offences at the discretion of prison officials.  Further, when a
violation involves visitors, the decision to take away an inmate's
visiting privileges is discretionary.

Prison Operational Procedure (OP) 709, which finds support in
AR 719 and governs visitation procedures at Ely State Prison,
provides that all visits must be approved by the Warden and that
the Warden may suspend visitation up to six (6) months if a visitor
or inmate possess any contraband.  Denial and termination of
visitation is documented and reviewed in accordance with AR 719. OP
709 ¶¶ 1, 7.

AR 719 provides that "[v]isitation is a privilege for inmates
... [and v]isiting privileges may be suspended upon orders from the
Warden/designee." AR 719 section III.  "Visiting privileges that
have been terminated indefinitely due to ... introduction of
contraband, should be reviewed every six (6) months for re-

10

consideration by the Warden at the written request of the visitor."
AR 719 section V, F ¶ 4. In addition, AR 719 states that "[n]o
person may be given permission to visit more than one inmate of the
Nevada Department of Prisons [excepting] ... immediate family
members. [Further, a]pproval for a person to change from one
visiting list to another will only be considered if the applicant
has terminated visiting with the original party for a period of at
least one year." AR 719 section V, A ¶ 8.  Decisions regarding
reinstatement of visiting privileges are highly discretionary.[3]

## IV.   Summary Judgment Standard

Summary judgment "shall be rendered if the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56©. The burden of demonstrating the absence of a genuine issue
of material fact lies with the moving party, and for this purpose,
the material lodged by the moving party must be viewed in the light
most favorable to the nonmoving party.  *Adickes v. S.H. Kress &
Co.*, 398 U.S. 144, 157 (1970); *Martinez v. City of Los Angeles*, 141
F.3d 1373, 1378 (9th Cir. 1998).  A material issue of fact is one
that affects the outcome of the litigation and requires a trial to

---

[3] The prison regulations quoted are those that were in effect at the time of
the October 2005 smuggling incident.  *See* Defendants' Mot. Summ. J. Ex. F; Opp'n
Egberto Mot. Summ. J. Ex. A.  AR 719 was amended in early 2010, however, the
language and substance of the pertinent policies are the same except for re-
numbering of sections and paragraphs. *Id.*

resolve the differing versions of the truth. *Lynn v. Sheet Metal Workers Int'l Ass'n,* 804 F.2d 1472, 1483 (9th Cir. 1986); *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). "A mere scintilla of evidence will not do, for a jury is permitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Board v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment."). Moreover, "[i]f the factual context makes the non-moving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a genuine issue for trial." *Blue Ridge Insurance Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing *Cal. Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)). Conclusory allegations that

are unsupported by factual data cannot defeat a motion for summary judgment.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

If the parties file cross-motions for summary judgment, the court must consider each party's motion separately and determine whether that party is entitled to a judgment under Rule 56.  In making these determinations, the court must evaluate the evidence offered in support of each cross-motion.  *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136-37 (9th Cir. 2001).

**V.   Analysis**

A.  First Amendment Freedom of Association[4]

"[F]reedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).  Some curtailment must be expected in the prison context.  *Id.*; *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002) (loss of intimate association part and parcel with confinement).  Spouses and family members of prisoners do not have rights or privileges to visitation distinct from those of the inmate to which they are married or related. *Hill v. Washington State Dep't of Corrections*, 628 F. Supp. 2d 1250, 1263 (W.D. Wash. 2009); *Harris v. Murray,* 761 F. Supp. 409, 412 (E.D. Va. 1990).  Prison regulations that curtail the right to freedom of association by restricting family visiting privileges are not necessarily unconstitutional. *See Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)(a prisoner has no

---

[4]  All plaintiffs (Sara Smith, Natalie and Ricky Egberto) assert a First Amendment freedom of association claim.

13

constitutional right to physical contact with his family); *Gerber*, 291 F.3d at 621(right of intimate association is necessarily abridged in the prison setting); *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010) (Right to freedom of association is limited in prison, thus, imposition of prison regulation preventing inmate from visitation with his children permissible.); *Block v. Rutherford*, 468 U.S. 576, 586, 589 (1984) ("[T]he Constitution does not require that detainees be allowed contact visits when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility."); *Overton*, 539 U.S. at 129-32(Despite how severely the prison regulations at issue restricted the prisoners' right to receive visits from family, they were still constitutional.); *Samford v. Dretke*, 562 F.3d 674, 682 (5th Cir. 2009) (per curiam) (holding the removal of prisoner's sons from the approved visitors list did not violate his constitutional rights); *see also Turner v. Safley*, 482 U.S. 78, 95-96 (1987).

A court need not determine the extent to which freedom of association survives incarceration if the regulation at issue bears a rational relationship to legitimate penological interests. *See Overton*, 539 U.S. at 132. Great deference must be shown to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hill*, 628 F. Supp. 2d at 1263; *Daniel v. Rolfs*, 29 F. Supp. 2d 1184, 1188 (E.D. Wash. 1998); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  The courts must not become unnecessarily involved in prison administration. *Id.*; *see also Procunier v. Martinez*, 416 U.S. 396,

14

405 (1974).  Prison officials must have the ability to anticipate security problems and address such problems as needed. *Id.*  Prison security decisions are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that prison officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417 U.S. 817, 827 (1974).

The court must consider four factors in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands a constitutional challenge. *Turner*, 482 U.S. at 89.  The first factor is whether there is a "valid, rational connection" between the regulation and a legitimate government interest.  *Id.*  The second is whether the inmate has an alternative means of exercising the allegedly impinged constitutional right. *Id.* at 90. Third, the court considers the cost to accommodate the asserted right on guards and other prison resources.  *Id.*  Finally, the court considers whether there are ready alternatives to the challenged regulation. *Id.*  The "absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.*

*I. Legitimate Government Interest*

Prison officials have a legitimate interest in using their limited resources to promote internal prison security.  Both Ricky and Natalie Egberto pose a security threat to Nevada's prisons.  On at least two occasions, Ricky Egberto was involved in contraband and drug smuggling incidents at NDOC facilities: first, in 1997

15

with visitor Linda Husky who attempted to smuggle methamphetamine into the Nevada State Prison for Ricky Egberto; and second, in October 2005 with plaintiff Natalie Egberto, who successfully smuggled in and transferred to Ricky Egberto heroin, a syringe, a handcuff key, and a knife. Def. Mot. Summ. J. Exs. A, H.  That the outside introduction of contraband and narcotics to the prison compromises the safety of prison staff and inmates is obvious.  The suspension of the visiting privileges of Ricky and Natalie Egberto was a valid, rational response to preventing the introduction of drugs and contraband to the prison. *See Robinson v. Palmer*, 841 F.2d 1151, 1156-57 (D.C. Cir. 1988) (holding that the permanent denial of face-to-face communications between inmate and his wife was not an "exaggerated response" to the perceived threat of visitors introducing drugs into the prison).

Based on the record before the court, it appears that Ricky Egberto is a high risk inmate, who continues to violate prison rules and has been involved in visitor related smuggling incidents in the past. Def. Mot. Summ. J. Exs. A-E, H-J.  Thus, suspending his visiting privileges bears a rational relationship to maintaining prison security.  Even though the record shows that plaintiff Sara Smith has not been involved in any wrong doing and does not pose a real security threat to the prison, a denial of Ricky Egberto's visiting privileges necessarily results in the denial of Sara Smith's privilege to visit him in prison. *See Hill*, 628 F. Supp. 2d at 1263 (family members of prisoners do not have rights or privileges distinct from those of the inmate to which they are related)*; Harris,* 761 F. Supp. at 412. *See also* Smith Mot. Summ. J. 4.

<em>ii. Alternative Means of Exercising Right</em>

Plaintiffs have alternative means of exercising the First Amendment right to association.  They may still communicate regularly with each other through the telephone and traditional mail. *See Overton*, 539 U.S. at 135 (phone calls and letter writing are alternatives sufficient enough to support prison regulation limiting visitations). In addition, plaintiffs may request reinstatement of their visiting privileges every six months.[5]  AR 719 section V, F ¶ 4.  "Alternatives to visitation need not be ideal[,]...they need only be available." *Overton*, 539 U.S. at 135.

<em>iii.  Cost</em>

Accommodation of the plaintiffs' right to association will overly tax prison resources, which are better allocated elsewhere. The October 19, 2005 successful smuggling incident makes evident that extra guards and a more through search of Ricky and Natalie Egberto would be required prior to and after each visit.  After his October 19, 2005 visit with Natalie Egberto, Ricky Egberto underwent an unclothed body search. Def. Mot. Summ. J. Ex. A. However, the smuggled contraband and narcotics were successfully secreted in his body cavities. *Id.*  Thus, a more extensive search of Ricky Egberto's person would be necessary, requiring additional

---

[5] On one occasion, Natalie Egberto requested reinstatement of visitation with Ricky Egberto and was denied in a February 7, 2008 letter from Warden McDaniel, which stated: "Your request for visitation has been reviewed.  Your request is denied.  This issue will not be revisited." Egberto Mot. Summ. J. Ex. L.  To the extent this letter suggests the visitation issue will never be reconsidered, such a position would be in violation of AR 719.

expenditures of resources.  Because of Ricky Egberto's extensive disciplinary history, similar procedure would likely be necessary after visits with other visitors, such as Sara Smith. *Id.* at Ex. E. Likewise, Natalie Egberto brought the smuggled contraband and narcotics to the prison in her car.  *Id.* at Ex. A.  To ensure such conduct is not repeated in the future, the prison would need to allocate manpower and time to thoroughly search Natalie Egberto's vehicle before each visit with her husband.  Thus, if plaintiffs were allowed to resume visits with Ricky Egberto additional security precautions at the prison would be necessary.

> *iv.  Absence of Ready Alternatives*

Plaintiffs have not suggested an alternative that would fully accommodate the asserted right while not imposing more than a de minimis cost to the penological goal of prison security. *See* Egberto Mot. Summ. J. 14-15; Smith Mot. Summ. J. 9-11.  *See also Overton*, 539 U.S. 136.

The law is clear and the record before the court shows that there exists no genuine issue of material fact as to plaintiffs' First Amendment claims.  Defendants' motion for summary judgment should be granted and all plaintiffs' First Amendment claims dismissed. Consequently, all plaintiffs' motions for summary judgment should be denied as to their First Amendment claims.

> B.  Fourteenth Amendment Due Process and Equal Protection

> *I. Due Process[6]*

Prisoners "retain [only] those constitutional rights that are

---

[6] All plaintiffs (Sara Smith, Natalie and Ricky Egberto) assert a Fourteenth Amendment due process claim.

not inconsistent with their status or with the legitimate penological objectives of the correctional system." *Edwards v. Carey*, 2008 WL 59155 *10 (E.D. Cal. Jan. 3, 2008).  Whether any procedural protections under the Fourteenth Amendment are due depends on the existence of a liberty interest and the extent to which an individual has suffered a grievous loss of liberty, even taking into account the nature of imprisonment. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Edwards*, 2008 WL 59155 *10 (quoting *Sandin v. Conner,* 515 U.S. 472, 483-4 (1995)(State-created "'liberty interests which are protected by the Due Process Clause,' ... are generally limited to freedom from restraint that 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'").  Liberty interests protected by Fourteenth Amendment must be more that "an abstract need or desire" and based on more than a "unilateral hope." *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972); *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981).  An individual claiming a protected liberty interest must be legitimately entitled to it. *See Kentucky Dep't Corrections v. Thompson*, 490 U.S. 454, 460 (1989).

     Certain prison regulations may create liberty interests protected by the Fourteenth Amendment. *Id.*  However, most prison regulations are designed to guide prison officials in the administration of the prison, not confer rights on inmates. *Witherow v. Crawford*, 468 F. Supp. 2d 1253, 1265 (D. Nev. 2006) (*citing Sandin*, 515 U.S. 472). Further, any prison regulation that creates a liberty interest must contain "substantive limitations on official discretion" or "explicit mandatory language." *Kentucky*

*Dep't Corrections*, 490 U.S. at 460, 462.

The law is clear that inmates do not have a right to visitation under the Due Process Clause of the Fourteenth Amendment. *Id.* at 460-1 (denial of prison access to certain visitors is well within the terms of confinement ordinarily contemplated in a prison sentence, thus, it is not independently protected by the Due Process Clause); *Dunn*, 621 F.3d at 1201 (Right to visitation is limited.); *Overton*, 539 U.S. at 129-32 (Despite how severely the prison regulations at issue restricted the prisoners' right to receive visits from family, they were still constitutional.); *see also Samford*, 562 F.3d at 682 (holding the removal of prisoner's sons from the approved visitors list did not violate his constitutional rights); *Wirsching v. Colorado*, 360 F.3d 1191, 1198-1201 (10th Cir. 2004) (upholding prison regulation that prohibited a prisoner from receiving any visits from his children so long as he refused to participate in a treatment program); *Ware v. Morrison*, 276 F.3d 385, 388 (8th Cir. 2002) (holding that the suspension of a prisoner's visitation privileges with his wife did not violate his due process rights); *Peterson v. Shanks*, 149 F.3d 1140, 1145 (10th Cir. 1998) ("[T]the Supreme Court has held that inmates have no right to unfettered visitation. Rather, prison officials necessarily enjoy broad discretion in controlling visitor access to a prisoner[.]" (internal citation omitted)); *Caraballo-Sandoval v. Honsted*, 35 F.3d 521, 525 (11th Cir. 1994) ("[I]nmates do not have an absolute right to visitation, such privileges being subject to the prison authorities' discretion provided that the visitation policies meet legitimate penological objectives."); *Robinson*, 841 F.2d at 1156-57 (holding that the

permanent denial of face-to-face communications between inmate and his wife was not an "exaggerated response" to the perceived threat of visitors introducing drugs into the prison); *Thorne v. Jones*, 765 F.2d 1270, 1273-75 (5th Cir. 1985) (holding prisoner had no absolute right to visits from his parents); *Harmon v. Auger*, 768 F.2d 270, 272 (8th Cir. 1985) (holding that an inmate does not have a liberty interest in contact visits); *Smith v. Coughlin*, 748 F.2d 783, 788-89 (2d Cir. 1984) (upholding prison regulation that prohibited contact visits from family); *Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir. 1984) (upholding the termination of family visits as a result of prison regulation violations); *Ramos v. Lamm*, 639 F.2d 559, 570 n. 26 (10th Cir. 1980); *Lynott v. Henderson*, 610 F.2d 340, 342 (5th Cir. 1980) (holding that "convicted prisoners have no absolute constitutional right to visitation"); *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 758-60 (3d Cir. 1979) (holding that prohibition of contact visits from family members does not violate prisoners' due process rights); *Feeley v. Sampson*, 570 F.2d 364, 372-73 (1st Cir. 1978).

In addition, NDOC AR 707 does not contain substantive predicates or mandatory language that would remove a prison official's ability to make discretionary decisions regarding prison visitation policies and create a liberty interest in prison visiting privileges. *Kentucky Dep't Corrections*, 490 U.S. at 460, 462. *See also* Opp'n Egberto Mot. Summ. J. Ex. A.

The plaintiffs – Natalie Egberto, Ricky Egberto and Sara Smith – do not have a constitutionally-protected liberty interest in the restoration of their visiting privileges.  AR 707 consistently defines visitation as a privilege and not a right.  Further,

although AR 707.12 states that inmates found to have drugs or alcohol in their systems will have "<u>NO</u> visits for one calendar year from the date of the incident [and a]ll visits will then be non-contact for the second calendar year," ultimately, the reinstatement of visiting privileges is discretionary and subject to the Warden's review.  *See* AR 707.12; AR 707.06 subsection 1.7 (inmate subject to the loss of visiting privileges if the misconduct relates to an incident involving visitors or MJ44/53/54 conviction); OP 709 (all visits must be approved by the Warden and that the Warden may suspend visitation up to six (6) months if a visitor or inmate possess any contraband); AR 719  section III ("[v]isitation is a privilege for inmates ... [and v]isiting privileges may be suspended upon orders from the Warden/designee"); AR 719 section V, F ¶ 4 ("[v]isiting privileges that have been terminated indefinitely due to ... introduction of contraband, should be reviewed every six (6) months for re-consideration by the Warden at the written request of the visitor.").  These regulations are highly discretionary.

While the October 26, 2005 email from the Deputy Director of NDOC Dorothy Holmes may have given the plaintiffs an expectation that visitation might be restored after two years, an expectation of a benefit is not enough to generate a liberty interest. *See Robinson,* 841 F.2d at 1155 (family members of prison who expected suspension of prisoner's visitation privileges to last only one year based on letter from department of corrections had no constitutionally-shielded liberty interest in the restoration of visiting privileges); *Connecticut Bd. of Pardons*, 452 U.S. at 465 (felon's expectation that his sentence will be commuted is "simply

1  a unilateral hope"); *Meachum v. Fano*, 427 U.S. 215, 228 (1976)

2  (felon's expectation that he will remain at a particular prison was

3  too "insubstantial" to invoke due process protections).  Thus, such

4  a denial does not implicate the procedural protections of the due

5  process clause. *Robinson,* 841 F.2d at 1155.

6       Moreover, as detailed above, when inmates violate prison

7  regulations, as plaintiff Ricky Egberto has, a typical sanction is

8  the loss of visiting privileges. Opp'n Egberto Mot. Summ. J. Ex. A.

9  The denial of plaintiffs' visiting privileges does not impose a

10 significant hardship, atypical to ordinary prison life on the

11 plaintiffs. *See Sandin,* 515 U.S. at 483-4; *Kentucky Dep't*

12 *Corrections*, 490 U.S. at 460-1 (denial of visitors is well within

13 the terms of confinement); *Gerber*, 291 F.3d at 621 (loss of

14 intimate association is part and parcel of imprisonment).  A Nevada

15 inmate and prison visitor are never guaranteed visitation, which is

16 a discretionary privilege and not a right.

17      To the extent that Warden McDaniel's letter dated February 7,

18 2008 was intended to be a permanent denial of plaintiffs' visiting

19 privileges, such a denial would not be consistent with NDOC policy.

20 *See* Egberto Mot. Summ. J. Ex. L (Letter stated: "Your request for

21 visitation has been reviewed.  Your request is denied.  <u>This issue</u>

22 <u>will not be revisited</u>." (emphasis added)).  Under express NDOC

23 policy, plaintiffs may continue to petition the prison for

24 reinstatement of their visiting privileges every six months. *See* AR

25 719 section V, F ¶ 4.

26      Even if the court found that plaintiffs had a due process

27 liberty interest in the restoration of their visiting privileges,

28 the record before the court clearly demonstrates the defendants

23

have been justified in denying their requests for visitation.  A
prison regulation or policy that impinges on a prisoner's
constitutional rights (and by extension the rights of their family
members) is still constitutionally valid if it is reasonably
related to legitimate penological interests.  *Turner,* 482 U.S. at
89; *see also Hill*, 628 F. Supp. 2d at 1263*; Harris,* 761 F. Supp. at
412.  Internal prison security is a legitimate penological
interest.  *Block*, 468 U.S. at 589 (that there is a rational
connection between a ban on certain visits and the security of a
prison is obvious).  Plaintiff Ricky Egberto is a proven security
risk to the prison. *See* Defendants' Mot. Summ. J. Exs. E, I.  As
outlined above, he has received numerous sanctions for disciplinary
offences, including sanctions for at least two smuggling incidents
– one involving Linda Husky in 1997 and a second involving
plaintiff Natalie Egberto on October 19, 2005. *Id.* at Exs. A-E, H-
I.  Likewise, plaintiff Natalie Egberto is a proven security risk
to the prison. *Id.* at Exs. A-C.  As outlined above, items
discovered in Natalie Egberto's vehicle on October 20, 2005
indicate she participated in the October 19, 2005 smuggling
incident. *Id.*  There is ample evidence that prison officials had
"both reason and obligation to ensure the safety of the [prison]
before allowing future visits [between Ricky and Natalie Egberto]
to occur." *Dunn*, 621 F.3d at 1204.

To the extent that plaintiff Sara Smith asserts a due process
violation relating to her visitation privileges at Ely State Prison

in general[7], defendants have not proffered a valid, rational connection between the denial of plaintiff Sara Smith's visiting privileges and prison security.  Defendants contend that Ricky Egberto has a history of manipulating women into smuggling contraband and drugs into NDOC prisons.  Def. Mot. Summ. J. 12-13. They also assert Sara Smith is especially vulnerable to manipulation because of her relationship to Ricky and Natalie Egberto. *Id.* at 14.  These assertions, without more, are insufficient to deny Sara Smith's prison visiting privileges.  Sara Smith is an independent adult.  The record before the court indicates she has never been implicated in any wrong doing or involved in any incidents of smuggling at NDOC prisons. Smith Mot. Summ. J. 4.  Denial of Sara Smith's prison visiting privileges is not rationally related to a legitimate penological interest. Indeed, on March 25, 2010 the court held a hearing on plaintiffs' motion for a preliminary injunction reinstating their visiting privileges. See Docket No. 40; Docket No. 116.  The motion for a preliminary injunction was denied as to plaintiffs Natalie and Ricky Egberto. See Docket No. 40.  It was denied without prejudice and with leave to renew as to plaintiff Sara Smith. See Docket No. 116.  The court directed defendants to conduct limited discovery on the issue of whether Sara Smith is prohibited from visiting the

---

[7] Defendants argue that plaintiff Sara Smith's claims are specific to her visiting privileges with plaintiff Ricky Egberto. See Def. Mot. Summ. J. 14. However, as the court addressed this issue at a hearing on plaintiffs' preliminary injunction on March 25, 2010, it bears addressing here. See Docket No. 40; Docket No. 116.

prison facility itself. *Id.* On April 22, 2010, defendants filed a response to the court's March 25, 2010 order. (Docket #118.)  The response was supported by a declaration from Warden E.K. McDaniel. In his declaration, Warden McDaniel stated that "Plaintiff Sara Smith may visit the prison facility itself if [she] is currently eligible for visitation under [NDOC] Regulations.  However, if [she] is eligible for visitation ..., [she] will still be prohibited from visitation with Plaintiff Rickey Egberto due to Plaintiff Rickey Egberto's visitation status." *Id.*  Thus, Sara Smith's general visiting privileges at NDOC prison facilities have been restored contingent on her being eligible under NDOC regulations.  Family members do not have privileges distinct from the inmate to whom they are related. *Hill*, 628 F. Supp. 2d at 1263*; Harris,* 761 F. Supp. at 412.  A denial of Ricky Egberto's visiting privileges necessarily imposes a limitation on Sara Smith's visiting privileges – she may visit the prison, but until the visitation privileges of Ricky Egberto are restored, she has no constitutionally protected right to visit him.

Accordingly, no genuine issues of material fact remain and all plaintiffs' Fourteenth Amendment due process claims should be dismissed.  Plaintiffs' motions for summary judgment on the due process issue should be denied.  Defendants' motion for summary judgment on this issue should be granted.

>           ii.  *Equal Protection*[8]

The Fourteenth Amendment right to equal protection survives

---

[8] Only plaintiffs Natalie and Ricky Egberto assert a Fourteenth Amendment equal protection claim.

incarceration.  *Baumann v. Arizona Dep't of Corrections,* 754 F.2d 841 (9th Cir. 1985).  To prevail on an equal protection claim, a plaintiff must show they have a fundamental right, they were intentionally discriminated against as a member of a protected class, or the prison regulation was not reasonably related to a valid penological interest. *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990); *Turner*, 482 U.S. at 89-91.

Where a "plaintiff does not allege a violation of a fundamental right or the existence of a suspect classification, prison officials need only show that their policies bear a rational relationship to a legitimate penological interest in order to satisfy the equal protection clause." *Daniel*, 29 F. Supp. 2d at 1188 (*citing Turner*, 482 U.S. at 89-90); *Coakley v. Murphy*, 884 F.2d 1218, 1221-22 (9th Cir. 1989). A regulation or policy "neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Edwards*, 2008 WL 59155 *11.  Thus, "the highly deferential rational basis standard applies to any equal protection challenges to" such regulations. *Id.*

Prison visiting regulations rarely implicate a fundamental right. *See Edwards*, 2008 WL 59155 *11 (family visiting regulation that required eligibility screening by corrections officer and proof of legal marriage license did not implicate equal protection principles); *Daniel*, 29 F. Supp. 2d at 1188 (restricting family visits to inmates married prior to incarceration did not implicate equal protection clause). "Neither prisoners nor visitors have a constitutional right to prison visitation." *Hill*, 628 F. Supp. 2d at 1262.  "The denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a

prison sentence.' ... Nor is access to a particular visitor independently protected by the" Fourteenth Amendment. *Navin v. Iowa Dep't of Corrections*, 843 F. Supp. 500, 504 (N.D. Iowa 1994)(quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) and (citing *Kentucky Dep't of Corrections*, 490 U.S. at 461).

Further, to state an equal protection claim, plaintiffs must show they were intentionally and purposefully "treated differently [by the defendants]... because [they] belonged to a protected class." *Hill*, 628 F. Supp. 2d at 1263 (quoting *Seltzer-Bey v. Delo*, 66 F.3d 961, 963 (8th Cir. 1995); *see also Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991); *Draper v. Rhay*, 315 F.2d 193, 198 (9th Cir. 1963). Showing that different persons are treated differently is not enough to show a violation of equal protection. *Griffin v. County School Board of Prince Edward Co.*, 377 U.S. 218, 230 (1964). Prisoners are not a protected or suspect class. *Webber v. Crabtree*, 158 F.3d 460, 461 (9th Cir. 1998).

While plaintiffs note that they are Native American and their beliefs have strong spiritual significance, they have not presented evidence that they are members of a protected class beyond this one statement. Egberto Mot. Summ. J. 14. They have presented no evidence of how this fact relates to their equal protection claims. Nor do they argue that it is the basis for any different treatment.

In addition, they have presented insufficient evidence that they have been intentionally treated differently from similarly situated inmates. In their motion for summary judgment, Natalie and Ricky Egberto list several allegedly similarly situated inmates whose visiting privileges were eventually restored after sanctions

for MJ 53 offences under AR 707.  *See* Egberto Mot. Summ. J. 16,
Exs. -PP.  However, plaintiffs have not presented any evidence that
(1) these inmates committed MJ 53 offences that were also connected
to visitors to the prison, (2) these inmates, like Ricky Egberto,
are serving life sentences for murder, (3) these inmates have
extensive disciplinary records similar to Ricky Egbertos', or (4)
these inmates, like Ricky Egberto, had been involved in several
other smuggling incidents at Nevada prisons.  *Id.*  The inmates
listed by plaintiffs in support of their equal protection claim are
not similar to Ricky Egberto.  Showing that different persons are
treated differently is not enough to show a violation of the Equal
Protection Clause.  *Griffin*, 377 U.S. at 230.

Lastly, if the prison regulation is reasonably related to a
legitimate penological reason, the equal protection clause has not
been violated. *Daniel*, 29 F. Supp. 2d at 1188.  The record before
the court clearly demonstrates that plaintiff Ricky Egberto
presents a serious security risk to the prison.  His disciplinary
history shows he regularly violates prison regulations and often
involves visitors in those violations. Def. Mot. Summ. J. Exs. E,
H-J.  The defendants also have presented ample evidence to justify
their conclusion that plaintiff Natalie Egberto is a security risk
to the prison.  Although the criminal charges against her were
dismissed, prison records show that she was involved in the October
19, 2005 smuggling incident. *Id.* at Ex. A.  Contraband, drugs, and
drug paraphernalia matching that found in Ricky Egberto's cell
following a lengthy in-person visit with Natalie Egberto was found
in her vehicle the next day. *Id.*  Denying visitation between Ricky
and Natalie Egberto is not an exaggerated response to the perceived

threat of a visitor, Natalie Egberto, introducing drugs and
contraband to the prison.  *See Robinson*, 841 F.2d at 1156-57.

Defendants' denial of plaintiff Natalie and Ricky Egberto's
visiting privileges bears a valid, rational relationship to a
legitimate penological interest.  Accordingly, plaintiffs Natalie
and Ricky Egberto's Fourteenth Amendment equal protection claims
should be dismissed and their motion for summary judgment denied.[9]

C.  Qualified Immunity

Qualified immunity shields government officials performing
discretionary functions from liability for damages "insofar as
their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In
determining qualified immunity, the court asks: (1) whether the
facts alleged, construed in the light most favorable to the injured
party, establish the violation of a constitutional right, and (2)
whether the right is clearly established such that a reasonable
government official would have known that "his conduct was unlawful
in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194,
201-2 (2001).  Which of these prongs is addressed first depends on
the circumstances of the case at hand.  The court has discretion to
grant qualified immunity on the basis of one "clearly established"
prong alone, without deciding in the first instance whether any
right had been violated. *Pearson v. Callahan*, 129 S.Ct. 808, 818

---

[9] The court, having concluded that judgment should be entered in favor of the
defendants on all of the plaintiffs' claims, declines to consider the issue of
standing raised in the defendants' pleadings.

(2009); *James v. Rowlands*, 606 F.3d 646, 651 (9th Cir. 2010).

The basic premise is that an inmate has a "fundamental liberty interest" in "the companionship and society of his or her child" or spouse outside of prison. *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001). However, rights allegedly violated "must be defined at the appropriate level of specificity before a court can determine if [they were] clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Calabretta v. Floyd*, 189 F.3d 808, 812 (9th Cir. 1999) ("The right the official is alleged to have violated must have been 'clearly established' in an appropriately particularized sense."); *Dunn*, 621 F.3d at 1201. "While an ordinary father [and husband] may possess a general right to a relationship with his child" and wife, an inmate with a long disciplinary history and serving a life sentence for murder "is no *ordinary* parent [and husband]. He is a parent [and husband] who is lawfully incarcerated." *Dunn*, 621 F.3d at 1201. Thus, the more appropriate question to ask when deciding qualified immunity in this case is: "whether a reasonable prison official could have believed terminating [an inmate's] right to receive visits from his [child and wife] was lawful, in light of clearly established law and the information he possessed." *Id*.

Based on the record before the court, a reasonable correctional officer would have believed his conduct was lawful. First, the preexisting law provided the defendants with fair warning that their conduct was lawful. As cited above, precedent from the Supreme Court and the Ninth Circuit "clearly establishe[s] that prisoners do not enjoy an absolute right to receive visits while incarcerated, even from family members." *Dunn*, 621 F.3d at

1201; *Block*, 468 U.S. at 589; *Kentucky Department of Corrections*, 490 U.S. at 461; *Overton*, 539 U.S. at 129-32.  The Ninth Circuit has also declined to recognize a prisoner's constitutional right to receive contact visits. *Dunn*, 621 F.3d at 1202-3 (*citing Gerber*, 291 F.3d at 621); *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996); *Barnett v. Centoni*, 31 F.3d 813, 817 (9th Cir. 1994) (per curiam); *Toussaint v. McCarthy*, 801 F.2d 1080, 114 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).  This was the established law at the time the defendants applied the challenged regulation, AR 707, to Ricky Egberto.  Thus, clearly established law supports a finding that defendants were aware their decision to suspend plaintiffs' visitation privileges was constitutional.

Second, the information possessed by the defendants when they restricted plaintiffs' visiting privileges reasonably justified the restriction.  As outlined and discussed in detail above, both Ricky and Natalie Egberto were involved in the October 19, 2005 smuggling incident, and Ricky Egberto had an extensive prison disciplinary history.  Def. Mot. Summ. J. Exs. A, E, H, J. Accordingly, they were deemed security risks.  Although, Sara Smith has not been implicated in any wrong doing, her visiting privileges were reasonably restricted based on Ricky Egberto's visitation status.

In the context of this case, the court concludes that none of the defendants could reasonably have anticipated that their conduct in restricting the plaintiffs' visitation privileges would be found to violate the Constitution. *See Noble v. Adams*, 2011 WL 906052 (9th Cir. Mar. 17, 2011).  Accordingly, defendants are entitled to qualified immunity.

## VI.   Conclusion

Defendants' motion for summary judgment is granted, plaintiff Sara Smith's motion for summary judgment is denied, and plaintiffs Natalie and Ricky Egberto's motion for summary judgment is denied.

IT IS SO ORDERED.

DATED: This 28th day of March, 2011.

_Howard D McKibben_
UNITED STATES DISTRICT JUDGE